## Van Sciver, Appellant, *v.* Zoning Board of Adjustment

Argued April 27, 1959. Before BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*John T. Curtin,* for appellant.

*Matthew W. Bullock, Jr.,* Assistant City Solicitor, with him *James L. Stern,* Deputy City Solicitor, and *David Berger,* City Solicitor, for appellee.

OPINION BY MR. JUSTICE McBRIDE, July 2, 1959:

We have for review an order dismissing an appeal from the Zoning Board of Adjustment of Philadelphia.

The structure involved is a one-story, garage type building of brick and cinder block construction located in a district zoned "A" Commercial. The latest use of the premises was as a storeroom for the owner's adjacent confectionery.

Appellant, the lessee of the property, sought a registration permit intending to install what is commonly referred to as a "laundromat" equipped with thirty coin operated automatic washers and ten automatic dryers. The items to be cleaned would be handled solely by the customers themselves. The applicant proposed operating the laundromat twenty-four hours a day seven days a week and it was to be unattended except for daily visits by a porter and a coin collector and periodic visits by a maintenance man.

The zoning board conducted a hearing at which the sole testimony was that of James Mitchell, an expert on the operation and maintenance of laundromats, statements by counsel for the applicant, and a petition signed by residents in the neighborhood in support of the application. The application was treated as a request for a variance, and a use registration permit was granted, conditioned on a limitation of business hours to the period between 8:00 a.m. and 8:00 p.m., Monday through Saturday and the requirement that some one be on duty during all hours of operation. The ap-

plicant's appeal to the court below challenging these restrictions was dismissed.

Appellant has maintained throughout that (1) A laundromat is a "Hand laundry or agency" within the meaning of §14-303(m)[1] of the Code of General Ordinances of the City of Philadelphia and is therefore permitted as a matter of right;

(2) Alternatively, this is a use "of the same general character as the uses" enumerated as being permitted as a matter of right under §14-303 and therefore should be permitted if a Zoning Board of Adjustment certificate[2] is obtained; and

(3) The conditions attached to the granting of the variance bear no reasonable relation to the health, morals, safety and general welfare of the public and are therefore arbitrary, capricious and unjust. These contentions will be considered in order.[3]

---

[1] "§14-303 'A' Commercial District. (1) *Use Restrictions-General.* The specific uses permitted in this district shall be the erection, construction, alteration, or use of buildings or premises and/or land for: (a) The uses permitted in any Residential District, except attached buildings used solely for dwelling purposes; provided that the provisions of this Section shall not apply to buildings or structures for which building permits have been obtained or the excavation for which or the construction of which has been begun prior to June 24, 1954; . . . (m) Hand laundry or agency; . . ."

[2] "§14-303(2) *Use Restrictions-With Certificate.* The following uses will be permitted in this district only if a Zoning Board of Adjustment certificate, as hereinafter provided, is obtained: . . . (1) Uses of the same general character as the uses specified above."

[3] At the outset, it must be remembered that where, as here, no additional testimony is taken in the court of common pleas our review is as on certiorari in its broad sense, and we must examine the record to see whether there is evidence to sustain the board's findings and whether the proceeding is free from any error of law or any manifest abuse of discretion. *Moyerman v. Glanzberg*, 391 Pa. 387, 138 A. 2d 681; *Landau Advertising Co. v. Zoning Board of Adjustment*, 387 Pa. 552, 128 A. 2d 559 (1957).

The zoning board of adjustment and the court below both rejected appellant's contention that his proposed use is permissible as a "hand laundry". The only related provisions in the City's zoning regulations are those for "Hand laundry or agency" in an "A Commercial district"[4] of the Philadelphia Code of General Ordinances and "Laundry (steam)" in a General Industrial District.[5] Nowhere in the Code are laundromats specifically mentioned. Thus, it is a question of analyzing what was intended by the distinction between the commercial and industrial classifications of the two types of laundries and determining by analogy to which the laundromat is most akin from a zoning standpoint. The court below in making this analysis deferred in great measure to the expertise of the zoning board. We also recognize that the board's experience in zoning problems does develop expertise *in some areas* upon which the Court should rely. This, however, is not one of those areas. The Board certainly knows no more about the operation of a laundromat than we do. They also had to rely on the testimony of an expert witness, Mitchell.[6] This Court can interpret this same testimony. In doing so we come to a different result. Today, almost all hand laundries require the use of some form of automatic washing machines and driers. The only difference between the use in question here and the ordinary type of hand laundry is that this one is unattended.[7]

---

[4] §14-303(m).

[5] §14-503(q).

[6] They were not bound to accept it but they did not reject it on that ground.

[7] This is clearly shown by the testimony of Mitchell before the Board: "MR. MITCHELL: . . . Then, of course, there have been the well-known hand laundry which I guess have been in existence since time immemorial, ever since someone did a washing for

In tracing the history of hand laundries to the present time Mitchell indicated how the unattended hand laundry, which we know as a laundromat, is the result of improving technology in this business.[8]

someone else. The hand laundry as we think of it, or the neighborhood laundry, has progressed in various stages, as I say, for a long long time they were strict hand laundries as such, and the washing end and wringing of the clothes was done entirely by hand up until the early part of this present century when the first mechanized type of washer was brought on the market. . . . Let me say that the hand laundry was the first to take advantage of this mechanized equipment. MR. CURTIN: When was this? MR. MITCHELL: 1914 or 1915 as far as the mechanization. BY MR. CURTIN: Q. You're speaking about the hand laundry as opposed to the power laundry, is that right? A. That's right. . . . Q. Let's say in the early 1930's, what kind of automatic equipment would many of these hand laundries use? A. Up until 1930 you say? Q. Up in the 30's let's say. A. They were very common for them to use what was known as a household type washer, a wringer washer. This naturally made it more efficient for them to do the washing which they were taking in and doing for people in the neighborhood. Q. Therefore what you're saying is that these hand laundries did have mechanized equipment, is that correct? A. Yes."

[8] "MR. REYNOLDS: What type of equipment would these hand laundries have, and how many washers? MR. MITCHELL: There was approximately twenty, twenty seemed to be a standard used. MR. REYNOLDS: An individual hand laundry would have twenty machines? MR. MITCHELL: Not necessarily. It would vary all the way from the hand laundry, for example, that might have only two or three machines, to a system in the work to larger stores that had as many as twenty. It all depended upon the limitations of the area and the size of the store. . . . MR. CURTIN: All right, now moving on from 1946 on, did the introduction of automatic washing equipment into hand laundry in any way spread? MR. MITCHELL: Yes, there was little change in the type of store that we have just been discussing about, for a period of eight or nine years other than growing very rapidly, however, in 1955 there was a decided change, and that was the first introduction of what has now become known as the unattended laundry. . . . They were installed with automatic equipment, there was no attendant, and

It seems clear that considering the history of this type of operation, what was intended by the choice of the words "hand laundry" in the code was a designation that the laundry allowed in a commercial district must not be industrial, i.e., a laundry plant which was steam operated. In fact, the words "hand laundry or agency" in themselves show that a hand laundry means a neighborhood commercial laundry as opposed to a steam or industrial laundry in that this classification allows an "agency" of an industrial laundry in that commercial district, but not the industrial operation itself. Furthermore, the creation in the code of classifications of commercial and industrial laundry operations implies that it was intended that the difference between the two was to be industrial versus commercial. A laundromat basically derives its value from the service which it provides for its patrons. It does not provide an industrial service, but rather, provides a service of a commercial nature. That is, it gives working men and women ready access to automatic washing procedures whenever they need them just as if they were more fortunate and could afford their own washing machines. This service should be permitted in a commercial district, ordinarily located on the fringes of residential districts, so that it is readily available to the users thereof.

From the history of the term "hand laundry" and the fact that many such laundries had mechanization when the ordinance was adopted, it would seem that the word "hand" does not refer to the method of laundering but is a term used in the laundry industry to

---

with the result they were so highly successful that they spread, frankly, all over the country. Today, in a period of the last two or three years, it is estimated there are about 4,000 of them presently in existence."

designate a neighborhood commercial operation as opposed to a steam or industrial operation.

Also, the distinction drawn by the court below that uses requiring large amounts of machinery are relegated to industrial districts while uses in commercial districts do not so use machinery is patently insupportable. The expert testimony clearly showed that all but the most primitive of hand laundries do use machinery. A glance at the uses permitted in a commercial district and the ones permitted in an industrial district demonstrates that the number of machines or type of equipment is not a criteria to determine in which district that activity is to be considered.

For example, among the specific uses permitted in a commercial district as a matter of right are a central heating plant, telegraph or telephone office, craftsmen's trades shops and job printing, engraving and print reproducing shops, all of which use machinery extensively. The key to determining in which district a laundromat is to be permitted is the "use" and the type of activity to be performed on the premises. It is our opinion that the use of this property as a laundromat is more analogous to a "hand laundry" than to a "laundry (steam)" and we hold it to be so within the meaning of the ordinance.

However, were we to hold that this is not a "hand laundry" within the meaning of the Code, there are also permitted in "A" Commercial districts "uses of the same general character as the uses specified above" [9] if a Zoning Board of Adjustment certificate is obtained. The standards to be observed in the granting or refusing of a certificate are those which are in harmony with the general purposes of zoning, namely, lessening of congestion in the streets, the pro-

---

[9] §14-303 (2) (1).

motion of health and the general welfare, and certain similar requirements.[10]

At the very least, it seems clear that this use as a laundromat is a use of the same general character as a hand laundry, particularly in the light of the mechanized character of the present hand laundries in operation. The mere fact that one is attended while the other is unattended does not change the pattern of zoning which is the deciding factor in whether a certificate shall or shall not be issued. A difference in the manner in which the same type use is performed is not a difference in use as prescribed in the ordinance. The use need not be an identical use but only a use "of the same general character". *Novello v. Zoning Board of Adjustment*, 384 Pa. 294, 121 A. 2d 91 (1956). A laundromat is more in harmony with the general pattern of zoning in this area than (or at least a use of the same general character as,) a central heating plant, craftsmen's trade shops and job printing, engraving and print reproducing shops would be, and these are permitted as a matter of right in an "A" Commercial district. Thus it is clear that the Board should have granted a certificate and not a variance conditioned upon certain requirements being met, and the court below was in error in affirming their order.

Lastly, the grant of a variance conditioned upon the restrictions imposed by the board was error. The

---

[10] §14-1802(3)(c): "The criteria for a Zoning Board of Adjustment certificate include: (.1) the lessening of congestion in the streets; (.2) the securing of safety from fire, panic, and other dangers; (.3) the promotion of health and the general welfare; (.4) the providing of adequate light and air; (.5) the prevention of overcrowding of land; (.6) the avoiding of undue concentration of population; (.7) the facilitation of the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements." See also *Food Corporation v. Zoning Board of Adjustment*, 384 Pa. 288, 121 A. 2d 94 (1956).

zoning board must base its findings of fact from the evidence in the record only. *Garner v. Zoning Board of Adjustment,* 388 Pa. 98, 130 A. 2d 148 (1957); *Schmidt v. Philadelphia Zoning Board of Adjustment,* 382 Pa. 521, 114 A. 2d 902 (1955). If the zoning board determination is arbitrary and contrary to the weight of the evidence, this Court may make its own ruling. *Lindquist Appeal,* 364 Pa. 561, 73 A. 2d 378 (1950). The board found that when these machines are not in perfect mechanical order they emit fumes and odors; that the proposed use will act as an allurement and be an attractive hangout for persons throughout the early hours of the morning; and that these unattended community operated laundries were an inducement to prowlers or other unsavory persons to commit possible crimes.

There is no testimony in the record to indicate that these machines emit fumes and odors nor that they attract undesirable elements.[11] It is thus obvious that these findings of fact by the board are arbitrary and

----

[11] "MR. CURTIN: Mr. Mitchell, in your opinion are these unattended stores an invitation to vandalism? MR. MITCHELL: No, not whatsoever. MR. CURTIN: Would you explain your position to the Board. MR. MITCHELL: Yes, I will be very glad to because that has been right from the very start something that has entered into the picture from a suspicion standpoint. Let me say that's the first question that appears to rise. However, let me say this: that all of the stores which I am familiar with, that I have ever heard of, vandalism, has never been an element. Actually the stores tend to repel or discourage vandalism. They are very brightly lighted all of the time, which of course discourages people. The stores are wide open. They are so designed so that every part of the interior of the store can be seen from the street. There just is no place to hide. There is no place in there whatsoever to encourage, there isn't enough money, for example, in the machines to encourage theft at any one time. Usually the money is collected once a day or every other day, so that—furthermore the equipment is protected in such a way that it's very difficult for anyone who is attempting to vandalize the equipment."

not supported by the record. They constituted unsubstantiated prophesies and were based solely on the opinion of the board itself. In addition, even if we were to accept them as true, they fail to show any reasonable relation to the conditions imposed by the board on the grant of this variance. The condition imposed that the laundromat may not operate before 8 a.m. nor after 8 p.m. denies the appellant the use of this property when other automatic hand laundries are in operation. If crimes are to be committed or the machines are to emit odors or fumes, or this would become a hangout for unsavory persons, all of this could occur between 8 a.m. and 8 p.m. as well as before or after. If such conditions come about they could presumably be handled by lawful police action. We do not take in the sidewalks or subways at night and even taprooms lawfully operate until 2 a.m. The condition attached that the appellant may not operate on Sunday has absolutely no bearing upon the imaginative evils the zoning board listed in its findings. Sunday is no different from any other day as far as the mechanical condition of a machine, or to unsavory people committing possible crimes, or to a place being an allurement in the early hours of the morning. If Sunday operation is a violation of the Act of June 24, 1939, P. L. 872, §699.4, 18 P.S. §4699.4, making it a criminal offense to perform any worldly employment or business on Sunday, there are specific statutory methods of proscribing the activity. It is not for the zoning board of adjustment under the guise of a zoning regulation to enforce the criminal statutes of this Commonwealth. We hold only that the restriction is inappropriate and not that Sunday operation is lawful.

The last condition that there be an attendant present on the premises at all times would remove from the operation of a laundromat all its attendant advan-

tages. The widespread use by the public of this type of service is due basically to its low cost which results from the very fact that it is unattended. To require an attendant is tantamount to banning it. To justify the requirement of an attendant, in a district zoned "commercial", the board would equally have to require an attendant if a laundromat were zoned "industrial" or the use of such laundromat in apartment houses zoned "residential". It must be remembered that the equipment in an unattended store is not only identical to the equipment in an attended store, but also to the equipment in the many apartment houses, military bases, universities, nurses' homes and similar institutions that have coin metered laundry facilities. Also, the mechanical operation of self-service stores and the equipment therein is no different from the usual washing operation at home where a housewife operates her own washing machine whenever she pleases. It is clear, therefore, that the conditions imposed not only are unreasonable but bear no reasonable relation to the health, safety, morals and general welfare of the public and would be an unnecessary, unwarranted and unreasonable intermeddling with the applicant's ownership of his property.

Order reversed.

Mr. Justice MUSMANNO dissents.

---

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in the result. The Philadelphia Code of General Ordinances designates two types of laundry facilities, to wit: "hand laundry or agency" in an "A" Commercial District (Sect. 14-303m) and a "laundry (steam)" in a General Industrial District (Sect. 14-503q). Although zoning legislators should keep

abreast of the constant economic and social changes occurring in their community, the Philadelphia City Council unfortunately did not contemplate this type of activity, and so the ordinance contains no mention or provision which covers a "laundromat." In addition, while the appropriate legislative body is authorized to enact zoning classifications, courts are loathe to interfere unless there is an abuse of discretion resulting in a classification bearing little or no relation to public health, safety, morals or general welfare. We must, therefore, interpret the zoning ordinance as it exists.

The activity in the instant case can be characterized as one that is ancillary to the use of a residency since it contains characteristics attributed to the householder's comfort. A review of the Philadelphia zoning scheme reveals that consumer facilities or household services are located generally in a zoning classification denominated "A" Commercial. Therefore, even though a "laundromat" was not a contemplated activity when the Philadelphia City Council passed the zoning ordinance, its characteristics are so reflective of consumer and home owner necessities that it should be permitted in an "A" Commercial District.